NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 9

No. 2020-131

| | |
|---|---|
| Colin Masseau and Emily MacKenzie | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Scott Luck, Sharon Luck, Guy Henning, Brickkicker/ GDM Home Services, LLC | September Term, 2020 |

Robert A. Mello, J. (motions to dismiss); Helen M. Toor, J. (final judgment)

Thomas C. Nuovo of Bauer Gravel Farnham, LLP, Colchester, for Plaintiffs-Appellants.

Samantha V. Lednicky of Murdoch Hughes Twarog Tarnelli, Attorneys at Law, P.C., Burlington, for Defendants-Appellees Brickkicker/GDM Home Services, LLC, and Guy Henning.


PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.


¶ 1. **ROBINSON, J.** Homeowners Masseau and MacKenzie appeal the trial court's order confirming an arbitrator's ruling dismissing their claims against defendants Guy Henning and Brickkicker/GDM Home Services, LLC. Specifically, homeowners challenge the trial court's referral of the case to arbitration on the ground that the purported arbitration agreement lacked the notice and acknowledgment provisions required under the Vermont Arbitration Act (VAA), and they urge us to vacate the arbitrator's award because the arbitrator exceeded his authority by manifestly disregarding the law. We conclude that the parties' contract affects interstate commerce, and that the arbitration agreement is therefore governed by the Federal Arbitration Act

(FAA) and is not subject to the more exacting notice and acknowledgment requirement of the VAA. We do not decide whether "manifest disregard" of the law is a basis for vacating an arbitrator's award because we conclude that any error in the arbitrator's legal analysis did not rise to the level of "manifest disregard." We thus affirm.

¶ 2.     Homeowners allege in their complaint that in 2016, they hired Guy Henning and Brickkicker/GDM Home Services, LLC (collectively "inspectors"), to inspect a house in Essex Junction prior to their closing on the purchase. Henning was aware of homeowners' plans to renovate the home while living there, and thus it was important for him to advise them of the potential hazards associated with stucco ceilings. Inspectors conducted the inspection and did not raise with homeowners the issue of potential asbestos in the house. Homeowners subsequently discovered asbestos and sued inspectors for failing to disclose the possibility that the stucco ceilings contained asbestos.[1]

¶ 3.     Inspectors filed a motion to dismiss, arguing in relevant part that the parties were required to arbitrate the dispute pursuant to the arbitration agreement in their contract, and that homeowners failed to state a claim on the merits because the inspection agreement excluded assessment of environmental hazards like asbestos. Homeowners opposed the motion, arguing that the arbitration clause in the parties' contract was invalid because it lacked the required notice and acknowledgment under the VAA, and also because it contained an unconscionable arbitration-selection term, designating an industry-created arbitration service as arbitrator. Alternatively, homeowners argued that there is evidence that the designated arbitration service no longer exists, thereby invalidating the arbitration agreement. With respect to the merits, homeowners argued that the allegations in the complaint were sufficient to support homeowners' various claims.

---

[1] Homeowners also sued Scott and Sharon Luck, the sellers of the house. Homeowners subsequently dismissed those claims, and they are not before us in this appeal.

¶ 4. The trial court concluded that the arbitration agreement was valid and enforceable. In particular, the court explained that the arbitration clause was subject to the FAA rather than the VAA and was compliant with the requirements of the FAA. The court did invalidate the arbitration-selection clause, but not the entire arbitration agreement. The court therefore stayed court proceedings between the parties pending a final judgment following arbitration and directed the parties to arbitrate with a mutually-agreed-upon arbitrator.

¶ 5. The parties chose and met with the arbitrator and agreed that the first issue was to address the merits of inspectors' motion to dismiss homeowners' claims under Vermont Rule of Civil Procedure 12(b)(6). After considering the parties' submissions, the arbitrator determined that the contract was limited in scope and "clearly excluded—by its express terms—any obligation to examine for asbestos." Thus, the arbitrator concluded that there was no factual basis to support homeowners' claims against inspectors. The trial court confirmed the arbitrator's decision and dismissed homeowners' claims.

¶ 6. On appeal, homeowners renew their arguments that the arbitration provision is unenforceable and contend that even if the arbitration agreement is enforceable, this Court should reverse the trial court's confirmation, and vacate the underlying arbitration decision, because the arbitrator exceeded his authority by manifestly disregarding the law. We address these arguments in turn.

I. Validity of Arbitration Agreement

¶ 7. The two-page (front and back) contract between homeowners and Brickkicker, signed by Henning as agent, stated both below the parties' signatures on the front and at the bottom of the back, "CONTRACT IS SUBJECT TO BINDING ARBITRATION." In addition, paragraph six of ten on the back of the contract stated, "Any dispute . . . shall be submitted to final and binding arbitration under Rules and Procedures of the Expedited Arbitration of Home Inspection Disputes of Construction Arbitration Services, Inc. . . . ."

3

¶ 8. Under the FAA, written provisions for arbitration are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The VAA contains similar language, see 12 V.S.A. § 5652(a), but also requires that an enforceable arbitration agreement contain a written acknowledgement that provides "substantially" as follows:

> ACKNOWLEDGMENT OF ARBITRATION.
>
> I understand that (this agreement/my agreement with _____ of _____) contains an agreement to arbitrate. After signing (this/that) document, I understand that I will not be able to bring a lawsuit concerning any dispute that may arise which is covered by the arbitration agreement, unless it involves a question of constitutional or civil rights. Instead, I agree to submit any such dispute to an impartial arbitrator.

Id. § 5652(b).

¶ 9. Homeowners argue that the VAA applies to the parties' contract and that because the contract here did not contain the required "acknowledgment of arbitration" provision, the arbitration agreement is unenforceable. Alternatively, they argue that the arbitration agreement is void because it includes an unfair arbitration-selection term. Inspectors argue that the FAA applies and preempts the VAA, and that the arbitration agreement is therefore enforceable. They contend that the arbitration-selection term is severable from the rest of the arbitration provision.

¶ 10. The applicability and effect of the VAA as compared with the FAA are questions of law that we review without deference to the trial court's ruling. Lofts Essex, LLC v. Strategis Floor & Décor Inc., 2019 VT 82, ¶ 33, ___ Vt. ___, 224 A.3d 116. We review the trial court's decision to sever the challenged arbitration-selection term for abuse of discretion. See Armendariz v. Found. Health Psychcare Servs., Inc., 6 P.3d 669, 695 (Cal. 2000) (decision whether to refuse to enforce contract as a whole, to enforce remainder of contract without unconscionable clause, or to limit application of any unconscionable clause as to avoid any unconscionable result is reviewed for abuse of discretion).

4

A. Applicability of the Notice Requirement in the VAA

¶ 11.   We conclude that the notice and acknowledgment requirement of the VAA does not apply to the parties' arbitration agreement in this case.  Our analysis, set forth more fully below, proceeds in several steps.  First, the reach of the FAA extends to the full extent of Congress's authority under the Commerce Clause.  Second, the transaction between the parties in this case falls within the broad scope of Congress's authority under the Commerce Clause.  We draw support for this latter conclusion not only from general Supreme Court case law involving the reach of the Commerce Clause, but also from specific cases applying the FAA to intrastate transactions.  The authority relied upon by homeowners does not persuade us otherwise.  Third, because the FAA preempts contrary state laws, the notice and acknowledgment requirement of the VAA does not apply here, and the arbitration agreement is not invalid or unenforceable on account of any failure to include the notice and acknowledgment language.

¶ 12.   If the transaction between the parties falls within Congress's regulatory authority under the Commerce Clause, their arbitration agreement is subject to the FAA.  By its plain terms, the FAA applies to "contract[s] evidencing a transaction involving commerce."  9 U.S.C. § 2.  The U.S. Supreme Court has said that "involving commerce" is the functional equivalent of "affecting commerce."  Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 273-74 (1995).  The breadth of this statutory language reflects an intent to apply the law expansively, exercising Congress's "commerce power to the full."  Id. at 277; see also Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003) (noting that the term "involving commerce" signals "the broadest permissible exercise of Congress' Commerce Clause power" and "encompasses a wider range of transactions than those actually 'in commerce'—that is, 'within the flow of interstate commerce' " (quoting Allied-Bruce Terminix Cos., 513 U.S. at 273-74)).  The threshold question, therefore, is whether the transaction between the parties in this case falls within the scope of Congress's regulatory power under the

5

Commerce Clause. See U.S. Const. art. 1, § 8, cl. 3 ("Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.").

¶ 13. Congress's power under the Commerce Clause is broad. It includes the ability to regulate (1) "the use of the channels of interstate commerce," (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities," and (3) "activities that substantially affect interstate commerce." United States v. Lopez, 514 U.S. 549, 558-59 (1995). The U.S. Supreme Court has recognized this final category of activities substantially affecting interstate commerce to include: "intrastate coal mining, intrastate extortionate credit transactions, restaurants utilizing substantial interstate supplies, . . . and production and consumption of homegrown wheat." Id. at 559-60 (citations omitted).

¶ 14. Applying these general principles, the U.S. Supreme Court has held that the FAA applied to intrastate transactions in two cases that are relevant to our analysis here. In Allied-Bruce, following a termite infestation, a homeowner sued the franchisee of an international exterminator company from whom she had bought a lifetime termite-protection plan. The exterminators invoked the arbitration provision in their contract and sought a stay to allow for arbitration under the FAA. The state courts denied the stay on the basis that when the parties entered into their contract, they "contemplated" a primarily local transaction that was not "substantially" interstate. Allied-Bruce, 513 U.S. at 269. The Supreme Court reversed. Rejecting the "contemplation" test, the Court concluded that the relevant question is whether the transaction in fact involved interstate commerce, even if the parties did not contemplate an interstate commerce connection. Id. at 281. Applying this test to the facts of the case, the Court noted that the parties did not contest that their transaction did, in fact, involve interstate commerce, and pointed to the multistate nature of both the franchisor and its franchisee, and the fact that the home-repair material used by the franchisee came from out of state, in support of that conclusion. Id. at

6

282. Because the franchisee in the Allied-Bruce case was itself a multistate firm, the decision sheds little light on the significance of a local business's franchise arrangement with a national company, but the decision does confirm that the parties' expectations as to the impact of their transaction on interstate commerce are neither relevant nor determinative of the reach of the FAA.

¶ 15. In Alafabco, the Court reaffirmed the broad scope of the FAA, holding that debt-restructuring agreements executed in Alabama between an Alabama company and an Alabama bank were subject to the FAA under the "involving commerce" test. 539 U.S. at 57. The Alabama Supreme Court concluded that the FAA did not apply because there was no showing that the restructured debt was attributable to interstate transactions, that the funds comprising the debt originated out of state, or that the restructured debt was inseparable from any out-of-state projects. Id. at 55. The U.S. Supreme Court reversed, relying on the facts that the company had "engaged in business throughout the southeastern United States using substantial loans from the bank" that were implicated by the debt-restructuring agreements; the debt was secured in part by the company's inventory of goods made from out-of-state parts and materials; and the impact of the "general practice" of commercial lending on the national economy. Id. at 57-58. The lesson of Alafabco for this case is that even where a particular transaction is wholly intrastate with no specific effect on interstate commerce, it is within Congress's reach if "in the aggregate the economic activity in question would represent a general practice subject to federal control." Id. at 56-57 (quotation omitted) (alteration omitted).

¶ 16. Although this is a close case, on the basis of these considerations, we conclude that the home-inspection contract between the parties does substantially affect interstate commerce for two reasons. First, inspectors operated their business pursuant to a franchise agreement with a company located outside of Vermont. We lack a sufficient record to determine the extent of impact on interstate commerce arising from this franchise relationship, but conclude that the fact that inspectors' service to homeowners was facilitated at least in part by their transaction in interstate

commerce with the national company with whom they have a franchise agreement carries some weight.[2] Second, although the parties' contract and the ensuing home inspection took place in Vermont, we cannot conclude that the transaction—when considered along with similar transactions "in the aggregate"—falls outside the sweeping scope of the Commerce Clause. Home inspections are frequently preconditions to securing financing to buy a house, and are accordingly integral to the real estate market. As a New York trial court explained persuasively in an unpublished decision addressing the same issue, "Here the inspection facilitates the home's purchase and without a doubt such activity affects commerce." Johnson v. Ace Home Inspections of Upstate N.Y., 52 N.Y.S.3d 246, 2017 WL 1050333, at *2 (City Court, Cohoes Cty. Jan. 19, 2017) (unpub. disposition). We need not determine whether either factor alone would support the conclusion that the parties' transaction was subject to Congress's regulatory authority; together, the two considerations reinforce that conclusion.

¶ 17.    The cases relied upon by homeowners do not convince us otherwise. In Eli Lilly & Co. v. Sav-On-Drugs, Inc., a pharmaceutical company argued that the State of New Jersey's attempt to require it to obtain a certificate to do business in the state violated the Commerce Clause because its business dealings in New Jersey were exclusively interstate commerce. 366 U.S. 276 (1961). The Court concluded that the company could be required to register because it was engaged in intrastate business but did not suggest that the company was not also engaged in interstate commerce. See id. at 282-84. Likewise, in the second case cited by homeowners, this Court concluded that a foreign corporation was engaged in intrastate business in Vermont such that it was required to register under Vermont laws. Pennconn Enters., Ltd. v. Huntington, 148

---

2    Inspectors assert in their brief, with no citation to the record, that we should conclude that the transaction affected interstate commerce because they are part of a national home-inspection franchise involved in multistate home inspections, they advertise and schedule through a centralized national website, and they use the same brochures, description of services, paperwork, and inspection report templates. We do not rely on these representations because they were apparently offered for the first time on appeal and lack any support in the record.

Vt. 603, 606-07, 538 A.2d 673, 675-76 (1987). The context and conclusions in these cases have little bearing on the issue here. In this case, there is no dispute that the parties' contract took place in intrastate commerce. The question, rather, is whether the transaction affects interstate commerce.

¶ 18. Likewise, we are unpersuaded by homeowners' reliance on an unreported federal case from the District of Nevada, where the court concluded it could not "find that home inspections of Nevada homes have a substantial impact on interstate commerce." Del Webb Cmtys., Inc. v. Partington, No. 2:08-CV-00571-RCJ-GWF, 2009 WL 3053709, at *17 (D. Nev. Sept. 18, 2009). In that case the court addressed whether a home-inspection company made false statements in interstate commerce in violation of the federal Lanham Act. The court concluded that there was an issue of fact as to whether the company made statements on its website advertising to conduct home inspections in other states, which would have made those statements "in interstate commerce." Id. at *16. In this case, the relevant question is not whether any specific allegedly false statements were made in interstate commerce, but whether the transaction in its entirety affects interstate commerce. In sum, we conclude that the underlying transaction in this case affects interstate commerce and the FAA therefore applies.

¶ 19. Because the FAA applies, it preempts the notice and acknowledgment requirement of the VAA. Although the U.S. Supreme Court has held that state law may be applied "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally," courts cannot invalidate arbitration agreements under state laws applicable only to arbitration provisions. Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 686-87 (1996) (emphasis omitted). The FAA therefore preempts the VAA to the extent that the VAA requires a specific notice and acknowledgment. The FAA "mandate[s] the enforcement of arbitration agreements," Southland Corp. v. Keating, 465 U.S. 1, 10 (1984), except on grounds existing "at law or in equity for the revocation of any contract," 9 U.S.C. § 2. For the above reasons, we reject homeowners'

9

contention that the arbitration agreement is unenforceable because it does not contain the notice and acknowledgement language required by the VAA.[3]

## B. Severability of Arbitration Forum Selection

¶ 20. We also reject homeowners' argument that the trial court improperly excised an unconscionable arbitration forum selection term from the parties' contract rather than striking the arbitration agreement as a whole. Homeowners contend that notwithstanding the severability clause in the parties' contract, the arbitration-selection term cannot be excised from the arbitration provision as a whole, and that the fact that inspectors presented them with a contract with an arbitration provision that had been called into question in a prior decision of this Court rendered the contract void. See Glassford v. BrickKicker, 2011 VT 118, ¶ 13, 191 Vt. 1, 35 A.3d 1044.

¶ 21. In Glassford, this court did not address the validity of the arbitration-selection term; we struck the entire arbitration provision because it was unconscionable when coupled with a limit on liability that is not included in the contract in this case. See id. In a separate opinion, Justice Dooley indicated that he would have stricken the limit on liability and remanded for the trial court to consider the conscionability of the arbitration provision in light of, among other things, the allegedly unfair arbitration forum selection term. Id. ¶ 35 (Dooley, J., concurring and dissenting).

¶ 22. We need not address the conscionability of the arbitration forum selection term here because the trial court struck it from the contract. Homeowners have cited no authority supporting its argument that defects in the arbitration forum selection term render the entire arbitration provision void as a matter of law. The arbitration-selection term was not central to the purpose of the arbitration agreement, or the contract as a whole, and can be excised without undermining the essential terms and purpose of the contract. Cf. Armendariz, 6 P.3d at 774-75 ("If the central

---

[3] Since we conclude that the notice and acknowledgement requirement is preempted, we do not address whether the contract here provided notice sufficient to meet the requirements of 12 V.S.A. § 5652.

10

purpose of the contract is tainted . . . then the contract as a whole cannot be enforced. If the illegality [or unconscionability] is collateral to the main purpose of the contract, and the illegal [or unconscionable] provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate."); In re Poly-Am., L.P., 262 S.W.3d 337, 360 (Tex. 2008) (concluding that unconscionable provision in arbitration agreement may be severed "so long as it does not constitute the essential purpose of the agreement"); see also 9 V.S.A. § 6055(c)(1) ("If a court finds that a standard-form contract contains an illegal or unconscionable term, the court shall: (A) refuse to enforce the entire contract or the specific part, clause, or provision containing the illegal or unconscionable term; or (B) so limit the application of the illegal or unconscionable term or the clause containing such term as to avoid any illegal or unconscionable result.") (effective Oct. 1, 2020).

¶ 23. For the above reasons, we conclude that the arbitration agreement was valid and enforceable and affirm the trial court's order referring the matter for arbitration.

## II. Manifest Disregard of the Law

¶ 24. We also decline to reverse the trial court's confirmation of the arbitrator's dismissal order on the basis that the arbitrator demonstrated manifest disregard of the law. As noted above, the gravamen of homeowners' various claims was that inspectors should have informed them that there was a risk of asbestos contamination in the stucco ceilings in the basement of the inspected home. Inspectors moved to dismiss homeowners' claims on the basis that inspection for asbestos was beyond the scope of the parties' contract. In particular, the contract contained prominently displayed and highlighted statements, on both sides, that "THIS IS A LIMITED INSPECTION." On the back of the agreement, within an enumerated list of ten conditions, the contract stated,

> The Client acknowledges what is being contracted for is a building inspection and not an environmental evaluation and the inspection is not intended to detect, identify, alert, or disclose any health or environmental concerns regarding the building(s) and/or adjacent property, including, but not limited to, the presence of asbestos . . . .

11

¶ 25.   In responding to inspectors' motion, homeowners relied on a state regulation and several allegations in their complaint that they contend precluded dismissal on the basis argued by inspectors.  Administrative Rules for Property Inspectors Rule 3.2(e)(3)(C) specifically provides that an inspector is not required to inspect for "the presence, absence, or risk of asbestos . . . provided, however, that licensees shall report visible and patent evidence of asbestos."  Administrative Rules for Property Inspectors, Rule 3.2(e)(3)(C), Code of Vt. Rules 04 030 007, https://sos.vermont.gov/media/1x5acqgz/administrative-rules-for-property-inspectors.pdf [https://perma.cc/V8X9-YXUP].  Homeowners argue that as a legal matter, inspectors had a duty to report "visible and patent evidence of asbestos" notwithstanding any contractual limitations on the scope of the inspection.  To establish that inspectors encountered such visible and patent evidence of asbestos, homeowners alleged, "It is commonly known in the housing industry that stucco ceilings installed in the 1970s contained asbestos.  This is important information that any housing inspector should have known."  They further alleged that Henning was aware that the house was built in 1972, but did not mention that textured ceilings were likely to contain asbestos, bring up the potential for asbestos in houses built during the 1970s, or state that testing for asbestos may be advisable in houses of that age.

¶ 26.   The arbitrator, purportedly addressing inspectors' motion to dismiss pursuant to Civil Rule 12(b)(6), dismissed homeowners' claims on the ground that there was no factual basis to support them.  He reasoned that the contract expressly stated that the inspection was not intended to detect, identify, or disclose the presence of asbestos and homeowners could have contracted for a more comprehensive inspection.  The arbitrator was unpersuaded by homeowners' citation to the administrative rules governing inspections because there was no allegation to support the claim that there was "visible and patent" evidence of asbestos in the home at the time of the inspection.  The arbitrator dismissed as "conclusory" the allegations that it is commonly known in the housing

12

industry that homes built in the 70s with stucco ceilings might harbor hidden asbestos, and that home inspectors should have known this. The trial court affirmed the arbitrator's decision against the homeowners' motion to vacate the ruling, noting that homeowners had authorized the arbitrator to rule on the motion to dismiss, and otherwise declining to revisit the arbitrator's decision.

¶ 27. On appeal, homeowners ask this Court to recognize "manifest disregard of the law" as a basis to vacate the arbitration decision. They contend that failing to do so would deprive Vermonters of their right to a remedy at law which is protected by the Vermont Constitution. See Vt. Const. ch. I, art. 4. They argue that the arbitrator manifestly disregarded the law here by declining to credit their factual allegations and dismissing them as "conclusory" when he was required to accept them as true for the purposes of his evaluation of inspectors' motion to dismiss under Civil Rule 12(b)(6).

¶ 28. The FAA does not expressly authorize courts to vacate arbitration decisions on the basis of arbitrators' legal errors, and whether manifest disregard of the law is a basis for vacating an arbitration decision under the FAA remains an open question. Those courts that have applied a "manifest disregard" standard have applied it narrowly; the standard does not authorize courts to vacate all arbitration decisions shaped by legal error. Because we conclude that the arbitrator's legal error in this case, if any, did not rise to the level of "manifest disregard" as defined by those courts that have applied the standard, we do not address whether the trial court or this Court is empowered to vacate the arbitrator's decision on this basis.

¶ 29. Legal errors are not among the grounds for vacating an arbitration award expressly identified in the FAA. We have stressed that the standard of review of an arbitration award by the trial court or by this Court is very limited. See Burlington Adm'rs' Ass'n v. Burlington Bd. of Sch. Comm'rs, 2016 VT 35, ¶ 14, 201 Vt. 565, 145 A.3d 844; Vt. Built, Inc. v. Krolick, 2008 VT 131, ¶ 13, 185 Vt. 139, 969 A.2d 80. The FAA provides four bases on which a court can vacate an arbitration award: "where the award was procured by corruption, fraud, or undue means"; where

an arbitrator was evidently partial or corrupt; where an arbitrator engages in misconduct that prejudices the rights of any party, such as by refusing to postpone the hearing despite sufficient cause or refusing to hear pertinent evidence; or "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(1)-(4).

¶ 30. Whether "manifest disregard of the law" is a basis for vacating an arbitration award—either as an additional ground or as a corollary to the statutorily enumerated bases, remains an open question. In Krolick, we interpreted the United States Supreme Court's decision in Hall Street Assocs., LLC v. Mattell, Inc., 552 U.S. 576 (2008), as holding that under the FAA a court has no authority to review for an arbitrator's legal errors. 2008 VT 131, ¶ 13 n.2. However, in the wake of a subsequent U.S. Supreme Court decision, we concluded that the U.S. Supreme Court has left open the question of whether manifest disregard of the law is " 'an independent ground for review' " of an arbitration award or " 'a judicial gloss on the enumerated grounds for vacatur' " under the FAA. Burlington Adm'rs' Ass'n, 2016 VT 35, ¶ 15 (quoting Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 672 n.3 (2010)); see also Weiss v. Sallie Mae, Inc., 939 F.3d 105, 109 (2d Cir. 2019) ("[M]anifest disregard remains a valid ground for vacating arbitration awards whether applied as judicial gloss or as an independent basis . . . ." (quotation omitted)). Accordingly, whether courts are empowered to apply the manifest disregard doctrine under either the VAA or FAA is again an open question. See Burlington Adm'rs' Ass'n, 2016 VT 35, ¶¶ 16-17.

¶ 31. Even if "manifest disregard" is a basis for vacating an arbitrator's decision, it does not allow a court to do so on the basis of ordinary legal errors. We have recognized that courts applying the manifest disregard doctrine to vacate arbitration awards do so on a very limited basis, viewing the arbitrator's decision with considerable deference. See id. ¶¶ 17-18. The Second Circuit has held that a court may vacate an arbitration award for manifest disregard of the law only

14

where it "finds both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." Wallace v. Buttar, 378 F.3d 182, 189 (2d Cir. 2004) (quotation and alteration omitted); see also Burlington Adm'rs' Ass'n, 2016 VT 35, ¶ 18 (recognizing two-pronged test for proving manifest disregard). Manifest disregard of the law is therefore more than "mere error in the law or failure on the part of the arbitrators to understand or apply the law." Westerbeke Corp. v. Daihatsu Motor Co., 304 F.3d 200, 208 (2d Cir. 2002); see also Giller v. Oracle USA, Inc., 512 Fed App'x 71, 73-74 (2d Cir. 2013) (summary order) ("[T]he manifest disregard of law standard essentially bars review of whether an arbitrator misconstrued a contract." (quotation omitted)). A court applying this standard should only vacate an arbitration award " 'in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent,' " such as " 'when an arbitrator strays from interpretation and application of the agreement and effectively dispenses [their] own brand of industrial justice.' " Weiss, 939 F.3d at 109 (first quoting T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 339 (2d Cir. 2010); then quoting Stolt-Nielsen S.A., 559 U.S. at 671). The arbitration award should be upheld if "the arbitrator has provided even a barely colorable justification" for the arbitrator's interpretation. Id. (quotation omitted).

¶ 32. Given this standard, even assuming that courts are empowered to vacate an arbitrator's decision based on manifest disregard of the law—which we do not decide—the asserted legal error in the arbitrator's decision here does not rise to the level of manifest disregard. Homeowners' argument is that the arbitrator misapplied the standard under Civil Rule 12(b)(6) in evaluating inspectors' motion to dismiss. Homeowners do not contend that arbitrators are necessarily bound by the rules of civil procedure. Cf. Robbins v. Day, 954 F.2d 679, 685 (11th Cir. 1992) ("Arbitration proceedings are not constrained by formal rules of procedure or evidence."), overruled on other grounds by First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938,

948 (1995). But they emphasize that in this case the arbitrator purported to decide inspectors' motion to dismiss pursuant to Civil Rule 12(b)(6) and then ignored the standards applicable under that rule. Homeowners have not identified an egregious impropriety by the arbitrator, or even a deliberate disregard of the applicable standard; their argument is that the arbitrator's analysis and conclusion are clearly wrong as a matter of law. This kind of straightforward misapplication of the applicable legal standard is not the type of legal error that is grounds for vacating an arbitration decision, even where "manifest disregard" is a recognized basis for vacatur. See ARMA, S.R.O. v. BAE Sys. Overseas, Inc., 961 F. Supp. 2d 245, 269 (D.D.C. 2013) (concluding petitioner's request to vacate based on manifest disregard of summary-judgment standard "fail[s] on the ground that this Court cannot correct errors in an arbitrator's reasoning, even when [the arbitrator] substantially misapplies an established legal standard"); Westerbeke Corp., 304 F.3d at 208 ("To vacate the award, we must find something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." (quotation omitted)); cf. Wallace, 378 F.3d at 193 (holding that "manifest disregard of the evidence" is not proper ground for vacating arbitrator's decision).

¶ 33. For these reasons, we affirm the trial court's order confirming the arbitration decision in this case.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 34. **REIBER, C.J., concurring.** I reluctantly join the majority's holding—that the parties' contract implicates interstate commerce and that the Federal Arbitration Act (FAA) governs their arbitration agreement—because the United States Supreme Court's recent authority

16

incorporates a broad construction of the FAA that compels this outcome. I write separately to make the point that the FAA was not intended to apply in this instance, and this outcome deprives the citizens of our state a remedy under the Vermont Arbitration Act (VAA) that offers greater protection than the FAA.

¶ 35. The FAA was enacted as a procedural statute, and 9 U.S.C. § 2 makes no express mention of state courts or state law. It provides that an arbitration provision in "a contract evidencing a transaction involving commerce" is valid and enforceable, "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (originally enacted as United States Arbitration Act, ch. 213, § 2, 43 Stat. 883 (1925)). But in 1984, the Court held that § 2 of the FAA created substantive law that applies in both federal and state court, and accordingly preempts state law whenever state law creates requirements that apply to arbitration agreements but not to all contracts. Southland Corp. v. Keating, 465 U.S. 1, 16 (1984). In effect, Southland limits the ability of states to fashion arbitration laws that provide more protection than federal law.

¶ 36. In dissent, Justice O'Connor argued that the Court construed the FAA incorrectly. Her dissent, worth reading in full, makes three key points. First, the Court misread two earlier decisions underlying its holding, neither of which involved state court litigation nor held that the FAA creates substantive law that applies in state court. Southland, 465 U.S. at 23-24 (O'Connor, J., dissenting); see Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404-05 (1967), and Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 23 (1983). Second, the FAA's legislative history unambiguously and conclusively establishes that "the 1925 Congress viewed the FAA as a procedural statute, applicable only in federal courts" and passed it under Congress's authority to control federal court jurisdiction. Southland, 465 U.S. at 25 (O'Connor, J., dissenting). Third, §§ 3 and 4 of the FAA explicitly limit the FAA's application to federal courts, so the statutory structure does not support the holding that § 2 applies in state courts. Id. at 22, 29. Most legal scholars have agreed with her conclusion. See, e.g., M. Moses, Statutory

17

Misconstruction: How the Supreme Court Created a Federal Arbitration Law Never Enacted by Congress, 34 Fla. St. U. L. Rev. 99, 99, 125 (2006) (arguing that judicial construction has rendered FAA "unrecognizable as the law Congress adopted in 1925" and noting that "almost all of the commentators who have written about Southland agree that this case was wrongly decided and inconsistent with congressional intent").

¶ 37.    But ignoring the clear line of authority cited by Justice O'Connor, subsequent decisions construing the FAA's range broadened its preemptive effect.  In Allied-Bruce Terminix Companies, Inc. v. Dobson, the Court interpreted the phrase "involving commerce" in § 2 to encompass the full scope of the Commerce Clause.  513 U.S. 265, 277 (1995).  The broad reach of the commerce power extends to economic activities that, even if entirely intrastate, substantially affect interstate commerce in the aggregate.  See United States v. Lopez, 514 U.S. 549, 558-59 (1995).  Following this reasoning, § 2 sweeps up into its fold virtually every commercial contract containing an arbitration provision within the bounds of the FAA—and consequently preempts state arbitration law.  Justice Scalia dissented in Allied-Bruce, concluding that the Court's FAA jurisprudence "entails a permanent, unauthorized eviction of state-court power to adjudicate a potentially large class of disputes."  513 U.S. at 285 (Scalia, J., dissenting).  Justice Thomas also dissented, laying out a persuasive argument that built on Justice O'Connor's dissent in Southland and noted that despite a lack of clear congressional intent to preempt, the Court "displaced an enormous body of state law."  Id. at 293 (Thomas, J., dissenting).  The Supreme Court of Alabama summarized the implications for state courts:

> [I]t would be difficult indeed to give an example of an economic or commercial activity that one could, with any confidence, declare beyond the reach of Congress's power under the Commerce Clause, and, by extension, under the FAA.  While there can be no per se rule that would preclude a trial court's role in evaluating whether a contract "evidence[es] a transaction involving commerce," . . . a trial court evaluating a contract connected to some economic or commercial activity would rarely, if ever, refuse to compel

> arbitration on the ground that the transactions lacked "involvement" in interstate commerce.

Serv. Corp. Int'l v. Fulmer, 883 So.2d 621, 629 (Ala. 2003) (footnote and citation omitted).

¶ 38. We face the same dilemma here. When the Vermont Legislature adopted the Uniform Arbitration Act and enacted the VAA, it added an acknowledgment requirement: to be enforceable, arbitration agreements must contain an acknowledgment, signed by each party, showing that the parties understand that they are agreeing to arbitrate and consequently will not be able to litigate any disputes arising out of the agreement, unless the dispute implicates constitutional or civil rights. 12 V.S.A. § 5652(b); see Joder Bldg. Corp. v. Lewis, 153 Vt. 115, 118-19, 569 A.2d 471, 472-73 (1989). The Legislature added this requirement in 12 V.S.A. § 5652, which begins by providing, like the FAA, that an arbitration provision or agreement "creates a duty to arbitrate, and is valid, enforceable, and irrevocable, except upon such grounds as exist for the revocation of a contract." Id. § 5652(a). By including the acknowledgment requirement after stating that arbitration agreements are generally valid, the Legislature clearly intended not to disfavor arbitration agreements, but simply to ensure that the parties are adequately informed before they sign the contract that contains this clause. This is because "[b]y agreeing to submit a controversy to arbitration, parties waive important rights, including trial by jury, procedural protections offered by the courts, and appellate review by an independent judiciary." Knaresborough Enters., Ltd. v. Dizazzo, 2021 VT 1, ¶ 11, __ Vt. __, __ A.3d __.

¶ 39. The FAA contains no similar acknowledgment requirement. Because the VAA requirement applies only to arbitration agreements and not to contracts generally, § 2 of the FAA preempts the VAA's acknowledgment requirement whenever an arbitration agreement falls within the FAA's broad jurisdiction. See Southland, 465 U.S. at 16. As a result, Vermont's acknowledgement requirement in 12 V.S.A. § 5652(b) is preempted here. See David L. Threlkeld

19

& Co., Inc. v. Metallgesellschaft Ltd. (London), 923 F.2d 245, 249-50 (2d Cir. 1991) (holding that FAA preempts VAA acknowledgement requirement).

¶ 40.    The U.S. Supreme Court has acknowledged that "[t]he FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 477 (1989). Rather, state arbitration law is preempted "to the extent that it actually conflicts with federal law—that is, to the extent that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (quotation omitted). Following this guidance, the Montana Supreme Court concluded that the FAA did not preempt a provision in the Montana Arbitration Act requiring specific notice that a contract contains an arbitration clause. The Court explained:

> Our conclusion that Montana's notice requirement does not undermine the policies of the FAA is based on the Supreme Court's conclusion that it was never Congress's intent when it enacted the FAA to preempt the entire field of arbitration, and its further conclusion that the FAA does not require parties to arbitrate when they have not agreed to do so. . . .
>
> Presumably, therefore, the Supreme Court would not find it a threat to the policies of the [FAA] for a state to require that before arbitration agreements are enforceable, they be entered knowingly. To hold otherwise would be to infer that arbitration is so onerous as a means of dispute resolution that it can only be foisted upon the uninformed. That would be inconsistent with the conclusion that the parties to the contract are free to decide how their disputes should be resolved.
>
> Montana's notice requirement does not preclude parties from knowingly entering into arbitration agreements, nor do our courts decline to enforce arbitration agreements which are entered into knowingly.

Casarotto v. Lombardi, 901 P.2d 596, 597-98 (Mont. 1995) (quotation omitted), rev'd sub. nom. Doctor's Assocs. v. Casarotto, 517 U.S. 681 (1996). However, the U.S. Supreme Court disagreed. It explained that because Montana's notice requirement would invalidate the arbitration provision,

the requirement undermined the goals and policies of the FAA, which are "antithetical to threshold limitations placed specifically and solely on arbitration provisions." Doctor's Assocs. Inc., 517 U.S. at 688. Following Southland, the Court concluded that the FAA preempted Montana law. Id.

¶ 41. The Court's preemption doctrine belies this conclusion. While the Supremacy Clause of the U.S. Constitution empowers the federal government to preempt state law, the Court "assume[s] Congress does not exercise [this power] lightly" and only displaces state law when it is "absolutely certain that Congress intended such an exercise." Gregory v. Ashcroft, 501 U.S. 452, 460, 464 (1991). Thus, the Court presumes "that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). Neither the text nor the legislative history of the FAA demonstrates any manifest intent to preempt state law, and in the absence of congressional intent, preemption is inappropriate. See Allied-Bruce, 513 U.S. at 293 (Thomas, J., dissenting); Moses, supra, at 133-34 (explaining that, given lack of congressional intent, "one might expect the Court to tread lightly in the area of FAA preemption" but "[i]nstead, the Court has come down heavily in favor of preemption, leaving little room to the states to regulate in this area").

¶ 42. The result is inconsistent with principles of federalism and harmful to consumers. Under these decisions, "federal courts have increasingly policed, and struck down . . . safeguards on arbitration passed by state legislatures." B. Farkas, The Continuing Voice of Dissent: Justice Thomas and the Federal Arbitration Act, 22 Harv. Negot. L. Rev. 33, 47 (2016). State notice requirements, which have been adopted by "a mix of traditionally conservative and liberal" states, are intended to protect consumers and parties with unequal bargaining power by ensuring that they knowingly agree to arbitrate any disputes and forego rights they would have in court. Id. at 41-43. As the Montana Supreme Court explained, these requirements do not prevent parties from

21

entering into arbitration agreements or otherwise undermine arbitration agreements. Casarotto, 901 P.2d at 597. Such protections simply do not conflict with the FAA.

¶ 43. Moreover, in this case, there is scant evidence to suggest that the parties' contract implicates interstate commerce. The record reflects that the contract's only connection to interstate commerce is that defendant inspector operates its business under a franchise agreement with a company located outside of Vermont. But the parties to the contract—the homeowner and the individual hired to perform the inspection—are Vermont residents. The contract was signed in Vermont and the work was to take place within Vermont's borders. Yet we cannot conclude that home inspections, in the aggregate, do not substantially affect interstate commerce. So, the FAA applies and preempts Vermont law. While the majority outcome is consistent with the United States Supreme Court's FAA jurisprudence, I write to make the point that the FAA when passed by Congress was not originally intended to preempt state law in such situations.

¶ 44. I am authorized to state that Justice Cohen joins this concurrence.

_____
Chief Justice